Herbert Kaufman v. Commissioner.
Kaufman v. Commissioner
Docket No. 88862.
United States Tax Court
T.C. Memo 1970-174; 1970 Tax Ct. Memo LEXIS 183; 29 T.C.M. (CCH) 766; T.C.M. (RIA) 70174; June 24, 1970, Filed *183 Herbert Kaufman, pro se, 1615 W. North Ave., Baltimore, Md.Arnold E. Kaufman, for the respondent. SCOTT Memorandum Findings of Fact and Opinion on Remand SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1950, 1951, 1952, 1953, and 1954 in the respective amounts of $157,813.75, $370,317.93, $305,542, $404,611, and $273,225.99; additions to tax under section 293(b) of the Internal Revenue Code of 1939 for the years 1950, 1951, 1952, and 1953 and under section 6653(b) of the Internal Revenue Code of 1954 for the year 1954 in the respective amounts of $78,906.88, $185,158.96, $152,671, $202,305.50, and $136,613; and additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for the years 1951, 1952, 1953, and 1954 in the respective amounts of $23,209.39, $18,142.85, $24,474.14, and $16,340.89. By amended answer respondent alleged that the deficiencies as determined by the Commissioner, after giving effect to the decision reached in Welsh Homes, Incorporated v. Commissioner, 279 F. 2d 391 (C.A. 4, 1960), affirming 32 T.C. 239 (1959), *184 relating to ground rents, were as follows: Year
Deficiency
Additions to tax under Sec.
Additions to tax under Sec.
293(b), IRC 1939 andSec.
294(d)(2) IRC 1939
6653(b), IRC 1954
(estimated tax)
1950
$ 149,639.33
$ 74,819.67
1951
347,674.45
173,837.23
21,850.78
1952
274,745.01
137,372.50
16,307.03
1953
372,339.67
186,169.84
22,537.86
1954
249,695.25
124,847.63
14,929.05
$1,394,093.71
$697,046.87
$75,624.72
On May 6, 1964, the memorandum findings of fact and opinion of this Court was filed and on August 20, 1965 the decision of this Court was entered. Eleven issues were presented for the determination of this Court one of which was the correct amount of petitioner's income from the sale of properties during each of the years in issue. This issue involved seven specific problems regarding the proper method for petitioner to report his income from the sale of properties. Some of the issues originally involved in the case were decided for petitioner and some for respondent. Petitioner appealed our decision to the United States Court of Appeals for the Fourth Circuit. The Court of Appeals affirmed the holding of this Court on *185 all issues raised on appeal except the "fair market value" of Standard Land Installment Contracts entered into by petitioner upon sales of property after July 1, 1951 and the "fair market value" of hypothecations which petitioner was required to leave with building and loan associations at the time those institutions granted mortgages to purchasers of property from petitioner. The Court of Appeals remanded the case to us for "further proceedings consistent with the opinion of the Court filed herein." The Opinion of the Court of Appeals filed October 18, 1966, Kaufman v. Commissioner of Internal Revenue, 372 F. 2d 789, 793, 794, stated in part: 767 The tax court found that the contracts at their inception had a fair market value of 70% of their face amount. The authority cited by the petitioner for the proposition that these contracts are valueless is distinguishable. In Morton Liftin, 36 T.C. 909, affirmed 317 F. 2d 234 (4 Cir. 1963), the instruments involved were second mortgages, while here the interests are equivalent to first mortgages in priority. Thus the property underlying the instruments in this case offers considerably more security *186 than in Liftin. In Estate of Coid Hurlburt, 25 T.C. 1286 (1956), the transaction involved was an isolated one in the community and on a nonstandard form. In the instant case the transaction is a very common one in Baltimore City, on a standard form, and one for which some market existed for such contracts. We cannot, however, affirm the tax court finding that the fair market value is 70% of the face amount. Once the determination of the Commissioner is found to be invalid the tax court must determine the deficiency. Cohen v. Commissioner, 266 F. 2d 5, 11 (9 Cir. 1959). That determination must be based upon substantial evidence and it is incumbent on the Commissioner, not the taxpayer, to come forward with that evidence. We conclude, therefore, that there is a receipt of property with a fair market value at the inception of the Standard Land Installment Contract and that it should be recognized; however, we remand in order that the tax court take further evidence as to what that amount should be. * * * * * * There is no question that in Baltimore a market exists for hypothecations. Though he has never sold any of his own hypothecations, the petitioner has *187 purchased hypothecations of others. During the years involved petitioner purchased hypothecations having a face amount of $208,800 at a total cost of $79,374.78. The tax court sustained the finding of the Commissioner that the hypothecations originally set up by the petitioner had a value of 50% of their face amount "since petitioner has failed to show error in the value determined by [the] respondent." We cannot agree with this finding. The tax court determined that in his own purchases of hypothecations petitioner "gave consideration both to the value of the property on which the mortgage for which the hypothecation was additional security was placed and to the credit standing of the mortgagor. He was selective in his purchases." (Emphasis added.) The market value, i. e., the prices actually paid by the petitioner, represented only 38% of the face amount of these hypothecations. It is difficult to see how the market value of petitioner's original hypothecations could be higher than the market value of this selected group. We, therefore, remand in order that the tax court may take evidence as to their value. Further proceedings were held on August 11 and 12, 1969, at which time *188 oral testimony was heard and documentary evidence received. In our memorandum findings of fact and opinion filed May 6, 1964 we made detailed factual findings and will not repeat those findings herein although the facts there found insofar as they bear on the issues on remand will be considered in reaching our conclusions. Our additional findings are based on the evidence received at the trial on August 11 and 12, 1969. Additional Findings of Fact Petitioner acquired at various times 237 pieces of property which he sold after July 1, 1951 and prior to December 31, 1954 to various individuals who made a small down payment and executed a Standard Land Installment Contract (hereinafter sometimes referred to as land contracts) agreeing to pay the balance in equal weekly or monthly payments. [1]
*189 Most of the 237 properties were two or three-story row houses located near the downtown area of Baltimore which had been constructed in the early 1900's. In the summer of 1969 at least 12 of these houses were no longer standing. At least 70 of these properties were occupied in the summer of 1969 by the person who had purchased the property from petitioner during the period from July 1, 1951 through December 31, 1954. Some of the properties were occupied by tenants in the summer of 1969. During the years 1950 through 1955, the real estate market in Baltimore with respect to properties of the type of the 237 properties here involved was stable. About 1960 because of other areas of Baltimore becoming available for purchase to persons who 768 had previously purchased property in the areas in which the 237 properties were located, the market for properties of the types of these properties became less stable. The following schedule shows information as indicated with respect to the 237 properties sold during the years here in issue: 1951
1952
1953
1954
Total or
Average
Number of Land
23
83
85
46
237
Installment Contracts
Average time lapse
3.7 months
4.5 months
5.0 months
7.8 months
5.3 months
between pur- chase
and sale
Sale price
$154,150
$564,910
$630,595
$351,080
$1,700,735
Amount of Installment
145,935
534,360
603,664
337,337
1,621,296
Contracts
*190 Properties similar to the 237 properties sold by petitioner during the period July 1, 1951 through December 31, 1954 sold for about the same prices as petitioner's properties and were also generally sold under land contracts. The credit standing of the purchaser of each of the 237 properties and his ability to pay under the terms of the land contract had only a small influence on the value of the land contract since the seller could repossess the property for a relatively small cost and resell it having all prior payments to minimize the risk of a resale at a lower price than the original sales price. On July 20, 1955, a property which petitioner sold on May 31, 1952 for $6,995.00 was valued at $6,500 by Baltimore Savings and Loan Association. On August 9, 1956, a property which petitioner sold on February 13, 1954 for $7,995 was valued at $7,500 by Baltimore Federal Savings and Loan Association. On July 10, 1956, a property which petitioner sold on June 1, 1953 for $7,495 was valued at $7,495 by Baltimore Federal Savings and Loan Association. On February 26, 1956, a property which petitioner sold on December 1, 1951 for $8,995 was valued at $9,000 by Baltimore Federal *191 Savings and Loan Association. On July 11, 1955, a property which petitioner sold on November 10, 1952 for $8,995 was valued at $8,900 by Baltimore Savings and Loan Association. On December 5, 1958, a property which petitioner sold on April 24, 1954 for $8,900 was valued at $8,900 by Baltimore Federal Savings and Loan Association. On March 12, 1956, a property which petitioner sold on September 1, 1952 for $6,995 was valued at $6,995 by Baltimore Federal Savings and Loan Association. On June 24, 1957, a property which petitioner sold on August 4, 1952 for $6,995 was valued at $7,000 by Baltimore Federal Savings and Loan Association. On November 17, 1954, a property which petitioner sold on July 3, 1952 for $6,995 was valued at $6,950 by Baltimore Federal Savings and Loan Association. On January 30, 1956, a property which petitioner sold on November 12, 1952 for $6,995 was valued at $7,000 by Baltimore Federal Savings and Loan Association. On March 12, 1957, a property which petitioner sold on February 16, 1953 for $6,995 was valued at $7,000 by Baltimore Federal Savings and Loan Association. On June 24, 1955, a property which petitioner sold on August 19, 1952 for $6,995 *192 was valued at $6,900 by Baltimore Federal Savings and Loan Association. On July 6, 1955, a property which petitioner sold on June 1, 1953 for $9,450 was valued at $9,450 by Baltimore Federal Savings and Loan Association. On July 10, 1956, a property which petitioner sold on August 27, 1954 for $7,995 was valued at $7,995 by Baltimore Federal Savings and Loan Association. On July 10, 1956, a property which petitioner sold on October 10, 1952 for $7,995 was valued at $7,995 by Baltimore Federal Savings and Loan Association. On July 10, 1956, a property which petitioner sold on March 17, 1953 for $7,995 was valued at $7,995 by Baltimore Federal Savings and Loan Association. On September 13, 1955, a property which petitioner sold on June 22, 1953 for $7,995 was valued at $7,995 by Baltimore Federal Savings and Loan Association. On September 16, 1955, a property which petitioner sold on November 16, 1953 for 769 $7,995 was valued at $7,995 by Baltimore Federal Savings and Loan Association. On July 16, 1956, a property which petitioner sold on May 20, 1953 for $7,295 was valued at $7,295 by Baltimore Federal Savings and Loan Association. On July 10, 1956, a property which *193 petitioner sold on February 8, 1954 for $7,995 was valued at $7,995 by Baltimore Federal Savings and Loan Association. On July 10, 1956, a property which petitioner sold on July 16, 1954 for $8,495 was valued at $8,495 by Baltimore Federal Savings and Loan Association. On September 16, 1955, a property which petitioner sold on June 23, 1952 for $7,495 was valued at $7,495 by Baltimore Federal Savings and Loan Association. On September 16, 1955, a property which petitioner sold on August 21, 1953 for $8,995 was valued at $8,995 by Baltimore Federal Savings and Loan Association. On September 16, 1955, a property which petitioner sold on July 25, 1953 for $9,950 was valued at $9,950 by Baltimore Federal Savings and Loan Association. On September 16, 1955, a property which petitioner sold on March 24, 1953 for $7,995 was valued at $7,995 by Baltimore Federal Savings and Loan Association. On July 10, 1956, a property which petitioner sold on July 12, 1954 for $7,995 was valued at $7,995 by Baltimore Federal Savings and Loan Association. On July 10, 1956, a property which petitioner sold on September 12, 1953 for $8,995 was valued at $8,995 by Baltimore Federal Savings and *194 Loan Association. The down payment received by petitioner on the sale of the above listed properties was in the respective amounts of $500.00, $350.00, $200.00, $900.00, $400.00, $300.00, $165.00, $500.00, $400.00, $225.00, $200.00, $300.00, $500.00, $225.00, $300.00, $250.00, $300.00, $300.00, $195.00, $250.00, $250.00, $300.00, $300.00, $500.00, $250.00, $200.00 and $500.00. The appraisal made by Baltimore Federal Savings and Loan Association represents the fair market value of the property on the date of the appraisal. During the years 1951 through 1954 petitioner acquired 179 original hypothecations. During the years here in issue, hypothecations were being bought and sold in Baltimore from as low as 30 percent of face value to as high as 90 percent of face value. During the years here in issue hypothecations which had just come into existence were considered to be a good investment if they could be purchased at one-third of face value. The hypothecations which were considered to be the best ones to buy were individual hypothecations. All the original hypothecations which petitioner acquired during the years here in issue were individual hypothecations covering one piece *195 of property and one mortgagor. Ultimate Facts (1) The fair market value of each of the 237 Standard Land Installment Contracts acquired by petitioner on the sale of each of the 237 properties which he sold under such contracts during the period July 1, 1951 through December 31, 1954 was petitioner's basis of the leasehold interest sold under the land installment contract. (2) The fair market value of each of the 179 original hypothecations acquired by petitioner during the years here in issue was one-third of its face amount. Opinion The issues here are purely factual. At the trial in August 1969 respondent offered the testimony of an expert witness as to the value of each of the 237 land contracts and the testimony of another expert as to the value of land installment contracts in general in the Baltimore area and the market conditions affecting such contracts during the years 1950 through 1954. The testimony of respondent's expert who testified in detail with respect to the value of the land installment contracts was that on each of the 237 properties the value of the land contract was an amount he considered as "net value of property to owner when sold." This value *196 was arrived at by adding to the cost of the leasehold to petitioner of each property, taxes and insurance for the period the property was held before its sale and an estimated amount for repairs and interest on petitioner's investment. From this total was subtracted an estimated cost of disposing of the property should petitioner have to repossess it. The resultant figure was the witness' opinion of the "net value" of the property to petitioner at the date it was sold. It was the witness' opinion that the primary value of the land installment contract was the value of the underlying property and that the value of the underlying property was his computed "net value" of the property "to owner when sold." 770 Respondent's other expert witness agreed that the value of the property sold under a land contract was the primary factor in determining the value of the land contract. He would have determined a fair market value of the various properties and in valuing the Land Installment Contract would have discounted this amount to some extent because of the risk involved in such an investment. Petitioner offered the testimony of one witness who had testified at the original trial that *197 a land installment contract would have a value at which the property which was the subject of the contract could be sold to a "dealer." At the original trial this witness testified that with respect to the properties involved in the instant case he would consider the price at which a property could be sold to a dealer to be petitioner's basis in the property. At the trial on August 12, 1969 this witness again testified that the value of the underlying property was the primary factor in determining the value of the land contract. However, he testified that the value of the land contract on each of the 237 properties was an amount ranging from 25 to 55 percent of the cost of the property in fee to petitioner. This resulted, of course, in a somewhat higher percentage of the cost of the leasehold interest which was the interest sold under the land contract. This witness explained his computation by stating that petitioner was not a good buyer of real estate and paid greatly over the market price for each piece of property he purchased during the years 1951 through 1955. This opinion of petitioner's expertise in the purchase of real estate is refuted by the evidence in this case as a *198 whole. The evidence shows that petitioner had substantial expertise in purchasing real property of the type of the 237 properties with which we are here concerned. Each of the expert witnesses looked to the value of the underlying property on a basis of a "quick" sale as compared to the fair market value of that property in a sale which would be negotiated over a period of time to determine the fair market value of the land contracts. Since the record shows that many of the properties here involved were purchased by petitioner at public auction or at distress sales and also shows that the properties were generally sold by petitioner within a few months after they were purchased at a negotiated price substantially higher than his purchase price, we have concluded from all the evidence of record that the fair market value of each land installment contract on each of the 237 properties at the date of sale of that property was the amount of the basis to petitioner of the leasehold interest that was sold. This amount is substantially less than the value placed on some of these properties by the building and loan association when granting a mortgage on the property. However, the mortgage *199 granted was not in the face amount of the determined fair market value of the property but only a percentage thereof. One of the witnesses compared the value of a land contract to the value of a first mortgage and stated that the value of a land installment contract would not in his opinion be the full amount of the fair market value of the property as determined by the Savings and Loan Association. At the trial on August 12, 1969 one expert witness testified as to the value of the hypothecations here involved. He stated that during the years 1950 through 1954 similar hypothecations sold in the Baltimore area from a low of 30 percent of their face amount to a high of 90 percent of their face amount. This witness was familiar with the specific properties here involved having been the officer of the lending institution who negotiated the mortgages on a number of them. In his opinion the hypothecations here involved at the time they were originated had a fair market value of one-third of their face value. We accept the testimony of this witness and have made an ultimate finding in accordance therewith. Decision will be entered under Rule 50. Footnotes
1. The provisions of these Land Installment Contracts are set out in our original findings and will not be repeated. Respondent's exhibit HHHH received at the trial on August 11, 1969, contains a description and in most instances a picture of each of these properties. Because of the volume of this exhibit the descriptions of the properties shown therein are not set forth in our findings. To a substantial extent this information was found in our original findings since part of this information, together with information as to other properties, is contained in Exhibits 14-N and 20-T, which we found as stipulated by the parties.↩